George R. TEICH, individually and as a stockholder of National Malleable and Steel Castings Company, suing on behalf of himself and all other stockholders of National Malleable and Steel Castings Company, similarly situated, and in the right of the National Malleable and Steel Castings Company, Plaintiff,

v.

NATIONAL CASTINGS COMPANY, a corporation, Defendant,

and

National City Bank of Cleveland, as Trustee of The National Castings Company Retirement Trust, New Party Defendant,

and

Cleve H. Pomeroy, Defendant.

Civ. A. No. 36214.

United States District Court
N. D. Ohio, E. D.

Jan. 17, 1962.

Murray Lichtenberg, New York City, and Craig Spangenberg, Spangenberg, Hasenflue & Shibley, Cleveland, Ohio, for plaintiff.

Victor DeMarco, Frank C. Heath, George H. Rudolph, Thomas Mulligan, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for defendant National Malleable & Steel Co. and Cleve R. Pomeroy.

Daniel W. Loeser, Hahn, Loeser, Keough, Freedheim & Dean, Cleveland, Ohio, for defendant National City Bank of Cleveland.

CONNELL, Chief Judge.

The Statement of Facts, as found on Pages 1 and part of 2 in the Defense Brief, is so well put, and so eminently fair from the viewpoint of both sides, that I will adopt it as a preliminary statement to what I will here find. It reads as follows, and we quote it:

"In 1949 defendant, National Castings Company adopted a general pension plan for salaried employees. The plan, which specifically provided that it could be later amended by the directors, was approved by the shareholders. In 1956 the directors, pursuant to the powers granted in

the original plan and pursuant to the newly enacted Section 1701.60 of the Ohio Revised Code enacted a comprehensive amendment to the plan which inter alia (a) reduced the age of eligibility from age 30 to 25, (b) reduced the service requirement from 5 years to 2 years, (c) increased the benefit rate on service before entry into plan membership from ⅔% to ¾%, (d) increased the benefit rate for membership service before 1957 from 1% to 1¼% and (e) changed the benefit rate for membership service after 1956 from 1% on all earnings on which a member contributed to 1% on earnings up to $4,200 during a year and 1¼% on earnings over $4,200 during a year and discontinued employee contributions on the first $4,200 of earnings in a year. The result was a general across-the-board increase of pension benefits from the old level established back in 1949. The amendment made no distinction between those employees over 65, those employees under 65 and retired employees. The amended plan was approved by the Commissioner of Internal Revenue as a qualified plan under Section 401 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 401, pursuant to which the Company deducts all payments to the Trustee as business expenses. Such approval was based on a finding by the Commissioner that the plan and amendments were, inter alia, benefiting at least 70 per cent of all employees and not discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

"Plaintiff's Amended Complaint now attacks the fact that the Company did not so distinguish and claims that the higher payments resulting from the 1956 amendment to those employees who were over 65 or already retired when the amendment was adopted should be stopped and that in the case of defendant Pomeroy such payments should be recovered. Plaintiff claims that such payments are an 'unreasonable gift of corporate funds, and an unreasonable waste and spoliation of corporate funds, and a heavy burden and expense to the corporation without reasonable or adequate consideration.' "

For the purpose of our discussion, may I first cite the pensions of the three highest officers of this company, and how their three pensions were changed by the 1956 amendment here in question.

Mr. Pomeroy's pension as of December, '49, was $9,630.51. The 1956 amendment made it $21,436.50. He was, as we all know, the President.

Vice President Moriarty, for 1949, was to receive a pension of $10,821. Under the 1956 amendment, Mr. Moriarty's pension was jumped to $21,535.

Mr. Wasson, another Vice President, was likewise jumped from $8,422 to $17,474.

All three were, therefore, approximately doubled by this amendment which is here in question.

The focal point of Plaintiff's attack herein is the pension of Mr. Pomeroy, to which we will confine whatever we hereafter say and find.

This is not just a legal battle between these two men, nor is it a personal fight between the shareholder and the President. This is an attack on a pension system in which the ex-president's pension has become the point of attack.

Plaintiff's Complaint is that a pension system, which was adopted in 1949 with the shareholders' approval, was amended in 1956 without their approval and, for that reason, is contrary to law.

I find that the 1956 plan was adopted as the result of much study—as has been shown by the evidence in the case—and that the United States Government Department which was involved, namely, the Internal Revenue Service, approved it. The money in the fund, to a great extent, comes in indirectly as an income tax deduction. This, indirectly, permits a company to retain more earnings if it will give them back to its employees under the form of a pension plan.

The plan herein adopted was the result of quite a study by Mr. Field, Vice

President, who testified concerning such plan. The plan had to do justice to a large number of superannuated employees to get the Government's approval. It had to do justice to all employees. It had to do justice to those employees who were not organized in the unionized sense, and it had to give comparable benefits to employees not organized. It would be obviously unfair if only the organized employees received such benefits, or so we believe the Legislature of Ohio believed when it enacted the statute here involved.

The Internal Revenue Service, as we have said, has approved the plan. The plan must apply to 70% to qualify, and no partiality may be given to those highest paid. These and other conditions must obtain, such as having to do with those eligible, how the funds shall be raised, the minimum annual amount necessarily to be paid in, and the deduction for past service. All of the required conditions were here met, to the satisfaction of the Internal Revenue Service.

All salaried personnel were covered, both unionized and not unionized. This company had to follow the type of plans followed within its industry. For four plants, they dealt with one union; and for another plant, they dealt with a separate union. These two different unions followed two different plans, and the salaried employees followed another— such a plan as was being utilized in similar plants in other industries.

The changes taking place throughout the country, both in pension systems and in the liberalization of pension rights, seem to require constant study of such frequent and constant evolution. Disparities in pension rights for salaried employees, and those on an hourly wage, require frequent adjustment. Living costs necessitate further adjustment. It appears that the study of pension inequities and the desirability of pension equities amounts to a new science, in which executives are now required to make detailed studies formerly limited to those who were skilled social workers, arithmeticians and actuaries.

The evidence before us indicates that pension plans are now evolved by corporations on a basis of scientific study of many factors, including what happens to employees and their needs, even during the period when they are on a pension.

As a result of much research and study and consideration of the company's financial status, the officers of this particular company decided a change in their pension plan to be desirable. The original plan in 1949 had been approved by the shareholders at their annual meeting. That approval related to the outlined plan which was contemplated at the time, which was to cost a certain amount; and that plan delegated control of pensions thereafter to its own Board of Directors. It goes on to relate, on Page 5 of the Amendment proposed as of March 3rd, 1949, this language, under the word "Amendment", after having set up the plan: "The company has the right at any time, by action of the Board, to amend the Plan in any respect except," and the exception is of no consequence here.

Before 1956, Ohio Statute § 1701.60 was enacted, giving directors authority to establish reasonable compensation, including pension benefits, for services to corporations by directors and officers.

The directors later changed the pension plan. The change made in 1956 came at a time when the company had had a number of very good years just behind it; years of much higher profits than had been true before the original plan went into effect in 1949.

The company was also experiencing a condition wherein men eligible for pension at 65 nevertheless continued to work, because they believed that if they went on pension, their pensions would not adequately sustain them, as has been brought out in the evidence here. That condition is rather universally true throughout our country and its economic life. It is the reason why millions work at two jobs, and why many pensioners work on an additional job.

The officers here considered the desirability of an amendment to the old pension plan, and a written report went to the directors as of October 18, 1956, on the subject; and the directors unanimously agreed on the suggested amendments as of December 13, 1956—which were later approved by the Internal Revenue Service of the United States per Defendants' Exhibit 7 herein.

This suggested amendment undertook to give ex-president Pomeroy the pension herein under question. It is noticeable that this increased pension is in proportion to that of two other top executives. Our question is, whether such pension benefits constitute reasonable compensation for services to the corporation.

The testimony before us indicates that the 1949 pensions were average or low, and that the 1956 pensions are average and not high. The testimony before us also indicates that in similar and comparable situations in companies doing $40,000,000 to $60,000,000 worth of business per year—as did this company—and hiring 4,000 to 5,500 employees per year —as does this company—that the pensions such executives receive is very comparable to that received here.

It is here Plaintiff's contention that the fact that the shareholders have not ratified Mr. Pomeroy's pension makes it illegal, and this Court is asked to require him to return to the Corporation pension benefits already received. Plaintiff bases such contention on the circumstances under which the shareholders approved the original plan in 1949.

In this respect, we find that in 1949 a proxy was sent to the shareholders herein, describing a pension system contemplated for employees not unionized, and which plan was later ratified by 97% of the votes of the shareholders. The proxy described the pension plan contemplated and the expected cost for several of the first years of its operation. It further provided that after the original stockholder approval of the plan, as set forth in such first stockholders' meeting, that any later amendments of the plan which would increase its costs, and any future change which it might be necessary to make in the plan, would be done by action of the Board of Directors without consulting the shareholders.

Once the shareholders adopted this plan in 1949, they thereby relinquished all control over this plan. They originally did have the option of not adopting any at all. Once they adopted this one, they turned future control of the plan over to the Board of Directors. Once they put that power in the Board, that power remained in the Board.

The Ohio Statute § 1701.60 put further specific power in the Board to establish reasonable compensation, including pensions, for services to the corporation, and authorized a Board of Directors to then delegate the Board's entire authority to one or more of its officers or directors. So, by Ohio law, all this authority can now be vested in that one man. Therefore, the stockholders of this company, and this stockholder, are no longer, and is no longer, entitled to pass on pensions and pension changes re officer pensions, because the Ohio statute now prescribes that it be done in the way in which it was done; also, in the very way in which the stockholders approved it be done in 1949. The law has now taken this authority from the stockholders and put it in the Board of Directors. The stockholders still have sufficient control of their companies, because they select the Board of Directors. Their agents, who are the Board of Directors, still have control. They can change or remove members, or all members, of any Board of Directors, so the statute now places the power of decision on pensions in the directors so selected by the stockholders. Thus, the stockholders have lost no real power. They have merely delegated their power. Ohio's statute but confirmed that delegation.

Herein, they delegated that power in 1949. The Legislature enacted it later— merely, in effect, approving legally what had already legally been done.

We have here learned, through the evidence in the case, that pensions, under

this evidence, now constitute a novel, complex and ever-changing science which must require constant study, constant attention, constant evaluation and constant revision—which is probably why the Legislature puts this responsibility on a Board of Directors, which is readily available, which meets monthly—or on immediate call—rather than on the remote body of shareholders far more distant from the local scene and not on ready call, and far more separated and far more inaccessible and, generally, meeting only at a yearly interval, and surely then hardly having time for the kind of detailed study and decision concerning which we have here been hearing from witnesses well cognizant of this subject. So the law itself sounds very reasonable.

The pension idea is worthy of some comment here. A pension is fundamentally a means by which it is attempted, by an employer, to bridge a gap left in the worker's lifetime, when old age forces him off the pay roll. In the servile state of the Middle Ages, the serfs were protected for life—meaning they were fed for life—even when they were too old to work.

Under the guild system, labor owned all the tools. Labor and capital were combined. Tradesmen furnished themselves with work till they died—and loved the work. Men owning tools had incentive; nobody had to give them any. They had incentive enough, and they had little concern with shorter hours and working conditions because they were in control. Labor made the sails, the iron, the ships, the glass, and built the universities and the cathedrals and equipped the fleets, and controlled the commerce of the world for centuries—and ran the cities besides. But when water power and steam production and electric generation came into use, labor lost control of the tools, because a mill run by water, a boiler run by steam, and a turbine run by an electric generator is purchasable only by a pooling of money by those who have superfluous money. The worker lost control of the tools and had to work for those who took over the production of the power. And

the shareholders thereupon became supreme. They were really the gentlemen of the realm. And both the worker and the serf then found themselves working by contract alone, and often starving when the contract terminated, because the master had no further responsibility towards him after the contract terminated; he owed him only what the contract called for. I can remember when, even in courtrooms, labor was always called a commodity.

The fortuitous combination of workers uniting in their common cause for pensions, and an income tax exemption given for the purpose, has given rise to recent pension plans which now fill the gap left when men are too old to work and must still live. Capitol—and I spell it with an "o"—thus provides a pension for labor's benefit, through the Government's acquiescence in not insisting on a larger tax.

The Ohio Legislature has enacted a statute to give management a similar protection and, in the nature of things, management is morally, as well as legally, entitled to that protection. Ohio law authorizes a reasonable compensatory pension for management's services to the corporation. If a man on a $20,000 annual salary gets a pension of $80,000 annually, on its face, such compensation appears unreasonable. But if a man on an $80,000 annual salary gets a $20,000 annual pension—what then? For that is our question: Is about one-fourth of one's salary reasonable as a pension? Is it, or is it not, about equal to the universal concept of our country regarding pensions?

Mr. Pomeroy, for many decades, had to keep a company profitably going, which hired 4,000 to 5,500 men in a half dozen plants, in several different places. In an industry supplying railroad parts—an industry long past its peak—it took some genius to keep 4,000 or 5,500 men busy. Mr. Pomeroy burned up a lifetime of that genius to keep his company and his men going during the 38 years of his service. His operation took in $40,000,000 to $60,000,000 a year, so he had tremendous

responsibility. He had to do the deciding and thinking so that 4,000 to 5,500 men would continue to get work.

In his final years, he was paid a total of approximately $80,000 annually—which I assume he well earned. He waived a $21,000 pension when he was between 65 and 68, and then took the pension. Is one-fourth his income a reasonable pension for the few years he has left? I would think so. First of all, he would have to live 6 years on his present pension to get back—at the rate of the $10,000 a year increase in pension he received—to get back the $63,000 of pension monies which he waived by continuing to work between 65 and 68.

Many men waive pensions. I happen to have had a fine father who was in our Fire Department for 47 years. He could have taken a pension when he had 25 years in. He worked 22 years more and waived it. Many men waive pensions. Many men would rather work than be on pensions. Their waived pensions become contributions.

The testimony here was that the average pension under this plan is $1,850. The testimony was, further, that the average pay received by the average pensioner before he went on pension was $7,678 a year. That is about the ¼ rule, because 4 times $1,850 comes to $7,400. So we see the ¼ rule applied across-the-board to all the pensioners of this company.

If the pay of the average worker under this salary plan, as was testified to here, doubled between 1949 and 1961 from an average of $3,853 to $7,678, then we are really on a 50-cent dollar, which applies equally as well to their pay and to Mr. Pomeroy's pension. And, of course, pensioners are as subject to income tax as is everyone else.

■ Under the workers' formula at the Sharon Plant, it has been here testified that Mr. Pomeroy would have been entitled to $28,000 a year. I think his pension is reasonable and so find, under all the conditions set forth in this case. In fact, one-fourth of one's pay is pretty

much the standardized pension throughout the country.

Evidence has here been adduced to the effect that under Social Security, Railroad Retirement, Civil Service and Military Service, increases in pensions previously granted, are the rule and not the exception. It appears to this Court that the herein increase was fair, reasonable and consistent with our changing times.

Our next question is, was it legal? Did the Board of Directors have a right to give such a pension under the statute?

Well, under the statute, the Board of Directors would not only have the right to establish a pension, but it could delegate such authority to one or more of its officers or directors. Under the law, its officer or director agent could so decide alone. Under the law, the one person so appointed could decide by himself.

So the only limitation on a pension so established or granted by the Board, or its delegated officer or its delegated director, is that it be reasonable. I believe that that is now the only particular in which a pension so granted is legally susceptible of attack.

We will note that the statute does not go back to the shareholders for any authority in any regard. The statute puts this power into that management which the shareholders have already selected. Obviously, if the shareholders were intended to be importuned for every pension, or change in pensions, and if shareholders had to decide whether workers would get pensions at all, or whether their dividends could or would be increased by their refusal to give pensions, only confusion and deep dissatisfaction would result.

Such confusion, unfairness and dissatisfaction our Legislature here sought to prevent. Such confusion, or possibility of unfairness, our Legislature controls by putting the power in the Board, the shareholder always retaining the power of Board selection.

The statute is most clear on the subject. The Board of Directors has authority to establish reasonable compensation, in-

cluding pensions. This gives a Board such power, irrespective of what the shareholders may say or think. They control the Board; they do not control what the Board does in this respect. This Board had that power by law, irrespective of what the shareholders once said, or now say. And when the shareholders once before voted a pension plan which had then contemplated a far lesser cost, that mere far lesser cost so contemplated, in and of itself, would not require further shareholder action at a later time to establish a pension plan at a higher cost, because a later statute now puts the power somewhere else, namely, in the Board of Directors. In fact, in 1949, that's exactly where the shareholders put that later power. Their plan and Ohio's law coincide.

In its brief, Plaintiff herein has said that if the shareholders would only approve the present plan, there would be no future claim of unreasonableness. In other words, it seems to me that the Plaintiff here really protests what it considers the illegality of the plan and not its reasonableness.

The Defense herein has introduced voluminous evidence tending to show and showing the reasonableness of Mr. Pomeroy's pension. It has done so by an exhaustive study and presentation of comparable situations of which evidence has been herein introduced. Plaintiff has offered no evidence in this respect to the contrary. And the burden, as we know, is on the Plaintiff to prove this pension to be unreasonable.

For the drastic far-reaching action which Plaintiff asks of this Court, Plaintiff has failed to prove this feature of his case by any evidence whatsoever. I find the pension plan as to Mr. Pomeroy reasonable, under all the evidence adduced in the case.

I find that the 1956 plan is perfectly legal, under our statute. I further find the specific pension of Cleve H. Pomeroy to be reasonable.

I find that this amendment was enacted in 1956 for a valid corporate purpose; and that it constituted a valid corporate action for which the Company has received adequate consideration in the form of varied intangible and tangible benefits, and for services to the Corporation itself in a great variety of ways, both before and after the age of 65 was attained by Mr. Pomeroy.

I realize that if we compare two machinists, of equal capacity and length of service and pay, for pension, their pension should be equal; and that it might be fair to say that the services they rendered the Company actually had ended the day they went on pension. That would all be very tangible. Their momentum would have ended the last time they turned off the current on their lathes.

We can all appreciate and understand the tangible things Mr. Pomeroy did for his Company. But only the empowered Board can appreciate the intangible things he did—and still does. Only the Board can understand and appreciate the momentum he gave his Company by constant effort, by years of making the friends to whom are made the sales—and the sales aggregated $40,000,000 to $60,000,000, as we know. Only the Board can understand the imagination, study, work, perseverance and effort necessarily expended to keep the 5,000 men working, in order to feed the 20,000 other people behind the 5,000 men working. I assume, from the size of this industry which has been here described, that the man here involved would be one of the few industrial giants in the area who has survived to the age of 65 or 68; and I would assume that the directors and officers who must now keep the business going at the pace he set can really understand the effect his efforts had, and still have, on this business and its survival.

When the Legislature so empowered the Board of Directors, it put the task of evaluating those services and the continuation of that business momentum in the hands of those who knew it best, in the hands of the directors—which is in the right place: for they watched the man work and could see the effect of what

he did, and the continued results of what he did. They can understand how it affected the Company, which still takes care of all of them. The leadership which emanates from such a man can be better felt and sensed than seen or proved. That leadership, which might be beyond accurate power of description, though it isn't tangible, is, nevertheless entitled to reward and recognition while its effects are lasting, and that question is one for the exclusive decision of the Board of Directors under the law of Ohio.

I, therefore, find for these Defendants, as I have indicated; and I ask that counsel prepare Findings of Fact and Conclusions of Law accordingly, with exception to the Plaintiff.